UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CHRISTINE A. BERGERSON,

        Plaintiff,                           **ECF CASE**

    -against-

                                   **Index No.** 6:06 CV 1476 DNH/GHL

NEW YORK STATE OFFICE OF
MENTAL HEALTH CENTRAL NEW
YORK PSYCHIATRIC CENTER,

        Defendant.

-----------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW**

**IN OPPOSITION TO DEFENDANT'S**

**SUMMARY JUDGMENT MOTION**

                                           Law Office of Paul N. Cisternino, P.C.
                                           Attorneys for Plaintiff
                                           16 Briarbrook Road, Ossining, NY 10562
                                           Tel. No. (914) 330-1527

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

PRELIMINARY STATEMENT......................................................................1

STATEMENT OF FACTS............................................................................1

CONTROLLING PRINCIPLES OF LAW.........................................................3

**POINT I**

THE PLAINTIFF HAS MADE OUT A
VIABLE HOSTILE WORK ENVIRONMENT CLAIM...........................4

**POINT II**

UNDER THE CIRCUMSTANCES, PLAINTIFF HAS
MADE OUT A *PRIMA FACIE* CASE, SHOWN DEFENDANT'S NON-
DISCRIMINATORY REASON TO BE ARGUABLY PRETEXTUAL,
AND ESTABLISHED THE INFERENCE OF DISCRIMINATION...............9

**POINT III**

PLAINITFF'S RETALIATION CLAIM.........................................................14

CONCLUSION.....................................................................................15

# TABLE OF AUTHORITIES

Ackerman v Oryx Communications, Inc., 810 F.2d 339 (2d Cir. 1987)..................4

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).................................3

Aslandis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)...........................3

Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999)......................................4

Chambers v. TRM Copy Centers Corp., 43 3d 29, 36 (2d Cir. 1994)...................9,13

Cook v. Pan Am. World Airways, Inc., 771 F.2d 635, 646 (2d Cir. 1985)...............14

Cornwell v. Robinson, 23 F.3d 694, 703-704 (2d Cir. 1994)..............................14

DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.)..................14

Holcomb v. Iona College, 521 F.3d 130 (2d Cir. 2008).......................................10

Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993)............................14,15

Mack v. Otis Elevator Co., 326 F.3d at 122......................................................4

Piesco v. City of New York, Dep't of Personnel, 933 F.2d 1149, 1154 (2d Cir. 1991)....3

Price Waterhouse v. Hopkins, 490 U.S. 228, 247 (1989)......................................10

Quaratino v. Tiffany & Co., 71 F.3d 58, 64-65 (2d Cir. 1995)...............................3

Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)..................3,9

Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999).........4

Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).....................................9

St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993)....................................9

Tomka v. Seiler, 66 F.3d 1295, 1304 (2d Cir.1995)............................................3

## *PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

### PRELIMINARY STATEMENT

Plaintiff Christine A. Bergerson brought the instant action alleging that her former employer, the New York State Office of Mental Health Central New York Psychiatric Center (hereinafter "defendant" or "CNY") subjected her to discrimination and to a hostile work environment, retaliated against her and terminated her based on racial affiliation and gender in violation of Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law. Pursuant to Federal Civil Rule 56 and the applicable Local Rules of this Court, the plaintiff submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. The plaintiff concedes that the Eleventh Amendment bars the State-based claims and accordingly withdraws the second, fourth and sixth causes of action.

### STATEMENT OF FACTS [1]

Plaintiff Christine A. Bergerson (hereinafter "plaintiff" or "Bergerson"), a white female, started working for the defendant CNY as a probationary Security Hospital Treatment Assistant in September 2004. See Cisternino Declaration, Exhibit B, Bergerson Affidavit ¶3. By her own account and that of several other employees, Bergerson was a good SHTA, without time or attendance issues, who properly used mutual shift exchanges ("mutuals") with other CNY employees. Berg. Aff. ¶¶4,29; Cist. Decl., Exh. E, Martin Tr. p.11; Cist. Decl., Exh. D, Richardson Tr. p.12.

---

[1] For a statement of the material facts for which there exist a genuine issue to be tried, the Court is respectfully referred to Plaintiff's 7.1 Statement in Opposition to Defendant's Summary Judgment Motion.

Almost from the outset, the plaintiff was exposed to a hostile work environment that took many forms, ranging from the racially offensive to many instances of objectionable sexually and gender-related conduct. Among other things, there were derogatory comments regarding hair braiding and people asking if Bergerson were part black because she had fat lips. See Cist. Decl., Exh. C, Berg. Tr. p. 90. There were also offensive computer screen savers, comments in front of coworkers implying that Bergerson exchanged sex for money, comments on her appearance and dress, and posters with Bergerson as the subject implying a romantic relationship with a supervisor that were displayed in the facility. Berg. Aff. ¶¶20,22,23; Berg. Tr. 30-32, 91. Additionally, Bergerson's repeated complaints to management were never addressed and she was, in fact, discouraged from reporting any incidents. Berg. Aff. ¶27.

In February 2005, the plaintiff began a personal social relationship with an African American male supervisor named Keith Richardson ("Richardson"); previously, they had been friends as well as co-workers. Berg. Aff. ¶6. However, even before the personal relationship began, other coworkers and supervisors indicated that they had a problem with the interracial aspect of Bergerson and Richardson's association; later, as the relationship progressed, these problems with coworkers and supervisors worsened. Berg. Aff. ¶7. Supervisor Greg McCormick said that he and other coworkers were aware of her relationship with Richardson, that it was not in her best interest to continue it. Berg. Aff. ¶9; Berg. Tr. 43. This racial animus about the relationship resulted in Bergerson's evaluations often containing false and misleading information which she attempted to formally dispute without effect. Berg. Aff. ¶30.

2

After having her probation extended, Bergerson was terminated on January 24, 2006 with an effective date of January 31, 2006; plaintiff believed the true reason behind her probation extension and termination was opposition to her relationship with Richardson and due to her gender. Berg. Aff. ¶35. Plaintiff requested and was given an "exit interview" on or about January 31, 2006, however nothing was done. Berg. Aff. ¶¶12,36. In plaintiff's most recent full year of employment she earned approximately $64,000. Berg. Aff. ¶37. Since the termination, she has been unable to find suitable replacement employment. Berg. Aff. ¶38.

## CONTROLLING PRINCIPLES OF LAW

When considering a motion for summary judgment it is axiomatic that all reasonable inferences are drawn in favor of, and the record is assessed in the light most favorable to, the party opposing the motion. Tomka v. Seiler, 66 F.3d 1295, 1304 (2d Cir.1995); Piesco v. City of New York, Dep't of Personnel, 933 F.2d 1149, 1154 (2d Cir. 1991), citing Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989). When facts are presented which are not only disputed but also from which differing conclusions may be drawn, all inferences and conclusions must be drawn in the light most favorable to the non-movant. Quaratino v. Tiffany & Co., 71 F.3d 58, 64-65 (2d Cir. 1995), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Aslandis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993); see also FRCP 56 (c).

The Second Circuit has directed that trial courts "be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal

3

circumstantial evidence supporting an inference of discrimination." <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999).

The movant's failure to demonstrate that there are *no* genuine issues of material fact means that a trial is required to determine the action. <u>Ackerman v Oryx Communications, Inc.,</u> 810 F.2d 339 (2d Cir. 1987). As discussed more fully *infra*, this case presents genuine issues of material fact which mandate denial of the defendant's motion and call for the resolution of the case by the trier of fact.

## **ARGUMENT**

### POINT I

### THE PLAINTIFF HAS MADE OUT A

### VIABLE HOSTILE WORK ENVIRONMENT CLAIM

The two elements needed for plaintiff's hostile work environment claim to succeed are as follows: she must prove "that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and that a specific basis exists for imputing the conduct that created the hostile environment to the employer." <u>Mack v. Otis Elevator Co.</u>, 326 F.3d at 122 (quoting <u>Richardson v. N.Y. State Dep't of Corr. Serv.</u>, 180 F.3d 426, 436 (2d Cir. 1999).

4

The record references many instances of racial and sexual/gender-related offensive conduct by which the plaintiff was victimized, spanning the time period from Bergerson's start at CNY to her eventual termination.[2] And contrary to CNY's claims, we are dealing with much more than "vague allegations."

Bergerson herself testified to myriad examples of offensive conduct which she reported to supervisors to no avail. As to race, Bergerson testified to derogatory comments regarding hair braiding and to people asking if she were part black because she had fat lips. Berg. Tr. 90. Supervisor Greg McCormick told Bergerson directly that "they were aware of my relationship with Richardson and it was not in my best interest to continue it." Berg. Tr. 43. Bergerson complained to Debbie Hollenbeck regarding "the racial things I was getting [because of] my alleged relationship with Richardson" and was warned "I better watch what I say, what I do." Berg. Tr. 51. Even an inmate told Bergerson that he overheard a group of white Training Assistants saying not to try to "hook up" with Bergerson because she "only did the bros." Berg. Tr. 44.

As to sexual or gender-related offensive conduct, Bergerson testified to personally observing a computer screen saver (while she was the only female present at that time in the ward), repeatedly scrolling the words "put it in your mouth;" her objection at the time was laughed off and the supervisor she reported it to (in this instance Keith Richardson) didn't respond. Berg. Tr. 30-32. As early as one of her initial training classes and

---

[2] Although the defendant references the date the personal relationship supposedly began to support their argument that the connection between the relationship and the discrimination is somehow "too tenuous," there's evidence of hostile treatment from well before the relationship actually began, in fact, while Bergerson and Richardson were merely "friends." Richardson stated that "people were getting the idea that I was dating her" in or about the time of the McCormick evaluation (which was in March 2005) but Richardson stated that at that time he was "just starting to know her [Bergerson]." See Cist. Decl., Exh. D, Rich. Tr. p.15. He said the relationship began sometime before Bergerson's probation extension. Rich. Tr. 16.

in the presence of other trainees, a female employee named "Adrian" implied that Bergerson exchanged money for sex with a facility doctor and asked the plaintiff "why is your p*** so good?" Berg. Tr. 91. Bergerson testified that virtually "every time I turned around I was hearing something about "bare foot and pregnant" and that "we [women] shouldn't be there." Berg. Tr. 49.

The defendant is also incorrect when they contend that Bergerson never had to deal with co-workers coming on to her. Bergerson replied affirmatively when asked at her deposition whether "a lot of the employees there were coming on to you?" Berg. Tr. 45. She went on to describe how [married] Charlie Kennish liked her and sent her quite a few emails and how she was told by coworker Ian Noel that "he should try to hook up with me because...I did the 'bros.' "Berg. Tr. 45, 59.

Significantly, the very nature of the conduct described and the lack of remedial action by management operate to impute liability to CNY. Bergerson testified that she complained to Grade 20 supervisor Debbie Hollenbeck "at least five different times within...the last six months of my employment there." Berg. Tr. 48. In fact, Bergerson approached Hollenbeck repeatedly and was told it was a man's environment and she needed to deal with it. Berg. Tr. 47. Supervisor Sue Walgie told Bergerson that women "weren't respected in the facility." Berg. Tr. 39. When another female employee, Laura Decker, complained to Hollenbeck about a discriminatory remark she was told that it was "not going to go well for her if she made...a big stink over it." Berg. Tr. 48,49. Hollenbeck also refused to discuss an anonymous note Bergerson received warning her to "watch your back" and also refused to discuss one of Bergerson's negative evaluations. Berg. Tr. 63,64,73.

6

And the fact that employees other than the plaintiff corroborated a substantial portion of these behaviors further bolsters her hostile work environment claim. Their testimony also establishes that a connection existed between the racial animus and Bergerson's discriminatory treatment. When asked whether various defendant employees had a problem with the relationship's interracial aspect when they became aware of it, Richardson replied "yes." Rich. Tr. 27. Richardson described having "been through it before with a previous interracial relationship" and that the other employees victimized the woman involved by "harassing her, mistreating her." Rich. Tr. 24,25. Richardson also testified that the relationship would work against Bergerson and her job and that "him [McCormick], Sue Walgie [and] numerous other people" had a problem with their relationship. Rich. Tr. 18. Two black coworkers told Richardson *directly* that they had a problem with his dating white females. Rich. Tr. 28.

Others provided further corroboration. Scott Martin responded "yeah" when asked at his deposition whether the racial aspect of their relationship was looked down upon by other employees at CNY and that he heard people remark on the nature of the relationship. Mart. Tr. 15,16. Martin also stated that Aaron Reid commented on Bergerson's alleged attraction to blacks and Martin also referenced people at CNY being "narrow minded." Mart. Tr. 27, 42. (Note: Nitti testified that allegedly offensive posters were most likely done by Aaron Reid. See Cist. Decl., Exh. F, Nitti Tr. at p. 21). Martin also said Bergerson was "singled out." Mart. 39. Martin stated that "Some people used to say she [Bergerson] dressed risqué" and went on to describe an incident where someone commented to him about Begerson's chest when she wore a sweatshirt. Mart. Tr. 18,19; Cist. Decl., Exh. G, Def. Resp. to Pl. RFA No. 30. Martin described the environment at

7

CNY as a place where a lot of profanity was used (Mart Tr. 20; RFA No. 31), as did Richardson. Rich. Tr. 35. Martin also referenced "inappropriate screen savers" and Richardson also corroborated the presence of offensive screen savers, even to the current day, stating "Yes, I do see them." Mart. Tr. 21; Rich. Tr. 30. Richardson testified that he heard from several different sources the rumor that Bergerson was exchanging sex for money and another one about Bergerson causing Charlie Kinnish's divorce. Rich. Tr. 33.

Some male employees felt a woman should not be working in the facility. Rich. Tr. 41. When asked whether there was anti-female bias towards women working in various units, Nitti responded "at times, yes." Nitti Tr. 13. Thomas Nitti also supported Bergerson's allegation that some kind of posters were displayed in the facility showing her and Nitti and implying that they were linked romantically. Nitti Tr. 18. Although there is some question about the offensive nature of the posters, it is left for the jury to decide, based on their direct observation of Nitti's testimony, the true nature of the posters and whether they were sufficiently offensive.

Under the circumstances, there is more than sufficient evidence coming from the plaintiff *and* from the defendant deponents that a severe and pervasive hostile work environment was allowed to rage uncorrected at CNY.[3] Additionally, the nature of the conduct alleged and the fact that plaintiff's repeated complaints were virtually ignored establish that the offensive conduct can be imputed to CNY. Because we already have evidence as to the existence of a hostile work environment, we are left only to evaluate its

---

[3] Even if we accept defendant's argument regarding the June 21, 2005 statute of limitations cutoff, the earlier events are illustrative of the kinds of behaviors to which the plaintiff was subjected and also help establish that the objectionable conduct took place pretty much throughout Bergerson's tenure at CNY.

8

severity and its effect on the plaintiff, which is properly within the jury's realm, requiring that summary judgment be denied.

## POINT II

### UNDER THE CIRCUMSTANCES, PLAINTIFF HAS MADE OUT A *PRIMA FACIE* CASE, SHOWN DEFENDANT'S NON-DISCRIMINATORY REASON TO BE ARGUABLY PRETEXTUAL, AND ESTABLISHED THE INFERENCE OF DISCRIMINATION

As discussed in detail below, defendant's motion should be denied for several reasons. In determining whether the plaintiff has met the de minimis initial burden of showing "circumstances giving rise to an inference of discrimination," the function of the court on a summary judgment motion is to determine whether the "proffered evidence shows circumstances that would be sufficient to permit a rational trier of fact to infer a discriminatory motive." It is not the province of the summary judgment court itself to decide what inferences should be drawn. See Chambers v. TRM Copy Centers Corp., 43 3d 29, 36 (2d Cir. 1994). Employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law. Ramseur v. Chase Manhattan Bank, 865 F.2d at 464; See also Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (Because an employer who discriminates is unlikely to leave a "smoking gun" attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence).

The Plaintiff has the "ultimate burden of persuasion" to demonstrate that the challenged employment decision was the result of intentional discrimination. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993). However, the Plaintiff is not required to

9

show that the employer's proffered reasons were false or played no role in the employment decision, but only that the were not the only reasons and that the prohibited factor was at least one of the "motivating" factors. Price Waterhouse v. Hopkins, 490 U.S. 228, 247 (1989). Though the ultimate burden may be carried by the presentation of additional evidence showing that "the employer's proffered explanation is unworthy of credence," it may often be carried by reliance on the evidence comprising the prima facie case without more. See Hicks at 2749.

In the instant matter, the defendant claims generally that Bergerson's probation was extended because she did too many mutual shift exchanges, that she could not therefore be properly evaluated, and that she was later terminated for performance-related issues. Under the law, a probationary or other employee can be terminated for any reason *other than* a discriminatory one. However, the evidence in the record reveals CNY's explanations for their actions as pretextual and indicates that at least one of the motives behind the defendant's treatment of Bergerson was racial animus. And, as the defendant apparently concedes, "interracial association" has been recognized as a protected class under Title VII. Holcomb v. Iona College, 521 F.3d 130, 139 (2d Cir. 2008).

For example, there is ample support in the record that, far from having performance issues, Bergerson was actually a good employee. Bergerson herself testified regarding work practices and events which support her professionalism and dedication. And coworkers concurred on the record. When asked whether Bergerson was a good training assistant based on his having worked with and observed her, Thomas Nitti responded "yes." Nitti Tr. 11; RFA No. 23. Nitti further testified "In my opinion Christine was a satisfactory employee who should not have been terminated" and he

10

Case 6:06-cv-01476-DNH-GHL   Document 22-10   Filed 07/21/08   Page 14 of 19

apparently also thought highly enough of Bergerson to recommend her for another job by contacting prospective employers after she had been terminated. Nitti Tr. 37, 39; RFA No. 26. Scott Martin agreed that she was a good employee as did Keith Richardson. Mart. Tr. 11, RFA No. 28; Rich. Tr. 12, RFA No. 14.

The dubious nature of defendant's explanations as to alleged performance deficiencies becomes even more apparent when examining the content and circumstances of plaintiff's evaluations. Keith Richardson, who has worked at CNY since 1982, testified that he should have done the evaluation which McCormack did and which he felt was an unfair assessment of Bergerson's performance. Rich. Tr. 10,13,17; RFA Nos. 15,16. [As an aside, Richardson characterized McCormick's competence level as "he functions at minimum standards. Rich. Tr. 14]. There's also evidence that Bergerson was being marked for termination, with Richardson testifying to a discussion he had with Glenn Block, in which Block told him Hollenbeck told Block to set up Bergerson for termination. Rich. Tr. 53. And Richardson testified that Joe White should not have done Bergerson's final termination evaluation because White was not sufficiently present, missing substantial work time after suffering a heart attack. Rich. Tr. 69.

In her September 2005 evaluation, which was the basis for extending her probation, Bergerson was rated "below average" in the "Reaction to Supervisor" section, largely based on an incident when she was supposedly speaking on the phone for an "excessive amount." The record indicates, however, that this incident was grossly mischaracterized by CNY management in an effort to justify their discriminatory actions. Scott Martin testified that Sue Walgie was incorrect in reprimanding Bergerson and that the phone incident should not have been included in Bergerson's evaluation, disputing

Walgie's version by saying "that's not the way it happened" and that Walgie acted "in an inappropriate manner," further adding that Bergerson "didn't do anything wrong." Mart. Tr. 35, 37. In addition to acknowledging that it was him on the phone with Bergerson, Richardson testified that he discussed the "phone incident" with Ken Paparella and thought it was cleared up but that Hollenbeck told Paparella to include it on Bergerson's evaluation. Rich. Tr. 19,20. Significantly, both Keith Richardson and Scott Martin drafted memorandums which exonerated Bergerson from any wrongdoing in connection with this incident. See Cist. Decl., Exh. H.

Also questionable is CNY's citing of Bergerson's allegedly excessive mutuals as the reason for extending her probation. First, there can be no dispute that the mutuals played *the* significant role in Bergerson's September 2005 probation extension. As the September 2005 evaluation states in the "Attendance" section: "Mrs. Bergerson's attendance has become the issue of why her direct supervisor is unable to properly evaluate her job performance. She was rarely working her scheduled time/shift due to doing numerous amounts of mutuals/swaps. Mrs. Bergerson honored all shift exchanges she was involved in. There are no issues with unscheduled absences. She's always on time." Bergerson received a rating of "unacceptable" in that evaluation's Attendance section.

So a key question arises as to why Bergerson was cited negatively for legitimately using "mutuals." It is undisputed that there is no prohibition against doing a certain amount of mutuals. Mart. Tr. 40. Additionally, there has never been a claim that Bergerson incorrectly utilized mutuals or failed to obtain the proper authorization for them. RFA No. 7. Nitti testified that during his three and a half years of service at CNY

that he had *never seen* an employee's probation extended based on using too many mutuals. Nitti Tr. 26; RFA No. 27. When asked whether he was aware of excessive mutuals resulting in another employee's probation being extended, Martin answered "Under oath, I never even heard of anything in my life" and also stated that he "mutualed" with her [Bergerson] on several occasions. Mart. Tr. 13, 14; RFA No. 29. In his evaluations of both probationary and permanent employees over his *twenty-six or so years* of service Richardson has *never* cited excessive mutuals as a negative. Rich. Tr. 38. He also testified that too many mutuals would not cause an employee to not be properly evaluated and that Bergerson's use of mutuals was an incorrect reason for extending her probation. Rich. Tr. 36, 75, 76.

In the present case the defendant has not proffered evidence of a dispositive non-discriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject. See <u>Chambers v. TRM Copy Centers Corp.</u>, 43 3d at 38 ("unless employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the fact finder after trial."). There remain many unanswered questions, particularly in regards to pretext, which, under the applicable legal standard, require review and the rendering of a verdict by a jury.

13

## POINT III

## PLAINTIFF'S RETALIATION CLAIM

A prima facie case of retaliation under Title VII requires the plaintiff to show "(1) participation in a protected activity known to the defendant (i.e., opposed discrimination or participated in a discrimination proceeding); (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and adverse employment action." DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.). Upon such a showing, the defendant must demonstrate legitimate reasons for its action, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive. Id.

Although technically not plead administratively, plaintiff's retaliation allegation can be considered under a continuing violation theory. Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone. Cook v. Pan Am. World Airways, Inc., 771 F.2d 635, 646 (2d Cir. 1985). The continuing violation exception applies to cases involving specific discriminatory policies or mechanisms. See Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993). Additionally, "a continuing violation may be found where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." See Cornwell v. Robinson, 23 F.3d 694, 703-704 (2d Cir. 1994). If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken

pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred. Lambert, 10 F.3d at 53.

As previously described, Bergerson and others testified to extensive discriminatory actions beginning almost from her first day on the job (the "training class" incident) and continuing to her eventual termination. Bergerson also referenced repeated but unheeded complaints to supervisors. And, perhaps most significantly, she testified that she was warned when she complained to Debbie Hollenbeck regarding "the racial things I was getting [because of] my alleged relationship with Richardson" that she'd "better watch what I say, what I do." Berg. Tr. 51. As Bergerson would eventually be terminated under undeniably questionable circumstances, Hollenbeck's warning would prove prophetic. Under these circumstances, it is unjust to deny the plaintiff the opportunity to be heard on her retaliation claim.

## CONCLUSION

As the controlling law dictates, it is the defendant's burden to prove that no material issues of fact exist which require trial, with the plaintiff, as the non-moving party, being given the benefit of having all reasonable inferences drawn in her favor. Here, plaintiff has established her *prima facie* case and provided enough evidence for an inference to be drawn that the defendant's explanations are arguably pretextual. For the foregoing reasons, defendant's summary judgment motion should be denied and the case permitted to proceed to trial.

Dated: Ossining, New York
July 15, 2008

Respectfully submitted,

Law Office of Paul N. Cisternino, P.C.
*Attorneys for Plaintiff*

By: *[signature]*

Paul N. Cisternino (Bar #514003)
16 Briarbrook Road, Ossining, NY 10562
(914) 330-1527